## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

CASE NO.  6:20-cv-52

**FEDERAL TRADE COMMISSION**,

      Plaintiff,

v.

**GRAND BAHAMA CRUISE LINE, LLC**, a Florida limited liability company,

**ULTIMATE VACATION GROUP, LLC also d/b/a ROYAL BAHAMAS CRUISE LINE, LLC**, a Florida limited liability company,

**TROPICAL ACCOMMODATIONS LLC also d/b/a GRAND CELEBRATION CRUISE LINE**, a Florida limited liability company,

**VSC, LLC**, a Delaware limited liability company and as an owner of Florida V.S.C. Inc.,

**CABB GROUP, LLC**, a Florida limited liability company,

**FLORIDA V.S.C. INC.**, a Florida corporation,

**JOHNATHAN BLAKE CURTIS**, a/k/a Blake Curtis, individually and as a manager of Ultimate Vacation Group, LLC also d/b/a Royal Bahamas Cruise Line, LLC, Grand Bahama Cruise Line, LLC, Tropical Accommodations, LLC also d/b/a Grand Celebration Cruise Line, and VSC, LLC,

**ANTHONY DIGIACOMO**, individually and as a manager of Ultimate Vacation Group, LLC also d/b/a Royal Bahamas Cruise Line, LLC, Grand Bahama Cruise Line, LLC, Tropical Accommodations, LLC also d/b/a Grand Celebration Cruise Line, and VSC, LLC,

**CHRISTOPHER A. COTRONEO**, individually and as a manager of Tropical Accommodations, LLC,

**CHRISTINA R. PETERSON**, individually and as an owner and manager of Cabb Group, LLC, and

**ROBERT J. PETERSON II**, individually and as a manager of Cabb Group, LLC,

      Defendants.

**COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION,
AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("Commission"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its complaint alleges:

1.      Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a) and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a) and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil penalties, permanent injunctive relief, disgorgement, damages and other equitable relief from Defendants for their violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Commission's Telemarketing Sales Rule ("TSR"), as amended, 16 C.F.R. Part 310.

**INTRODUCTION**

2.      Between 2011 and 2012, Caribbean Cruise Line, Inc. ("CCL"), a Florida-based cruise line company, operated a massive telemarketing campaign that placed billions of survey robocalls to consumers offering "free" cruise vacations aboard the MS Bahamas Celebration, a cruise ship that departed from the Port of Palm Beach.  In 2015, the FTC and its state partners filed charges against—and reached settlements with—all of the defendants in the case  *See FTC v. Caribbean Cruise Line, Inc., et al.*, No. 0:15-cv-60423 (S.D. Fla.).  Among other things, the settlement prohibits CCL from engaging in illegal telemarketing.  Although not named in the lawsuit, during that same time-period, Defendants Johnathan Blake Curtis and Anthony DiGiacomo each owned and operated a telephone call center that marketed the "free" cruise vacations for CCL.

3.      Both prior to and after settlement of the original lawsuit, the owners of CCL have operated cruise-related companies that provided fulfillment of "free" cruise vacation packages.

Beginning in September 2013, Curtis and DiGiacomo jointly owned and/or operated several business enterprises that flooded American consumers with millions of unwanted telephone calls offering "free" cruise vacation packages on behalf of these subsidiary fulfillment companies.

4.      Curtis and DiGiacomo spearheaded the formation and operation of Ultimate Vacation Group, LLC also d/b/a Royal Bahama Cruise Line, LLC ("Ultimate Vacation Group" and "Royal Bahama"), Grand Bahama Cruise Line, LLC ("GBCL"), Tropical Accommodations, LLC also d/b/a Grand Celebration Cruise Line ("Tropical Accommodations"), and VSC, LLC ("VSC") (collectively, "GBCL Corporate"), which initiated, caused the initiation of, and assisted and facilitated the initiation of, millions of violations of the TSR, including millions of calls to numbers on the National Do Not Call Registry ("DNC Registry").

5.      The following chart illustrates the structure of GBCL Corporate's telemarketing operation and the call process:

**GBCL Corporate's Cruise Vacation Telemarketing Enterprise**

*\* indicates defendant*

| | | | | |
|---|---|---|---|---|
| **Robocall Initiators** | GBCL Corporate used these companies to purchase sales leads from third-party lead generators that placed survey robocalls pitching "free" cruise vacations as a way to generate potential customers | **Royal Bahama\*** Owner: Curtis & DiGiacomo Control: Curtis & DiGiacomo | | **GBCL\*** Owner: Worstell Control: Curtis & DiGiacomo |
| **Autodialers** | GBCL Corporate used these companies to place large volumes of autodialed telephone calls to sales leads purchased from lead generators | **Unnamed Autodialer Vendors** Provided automated web-based dialing platforms that permitted Call Centers to start outbound telemarketing campaigns to sales leads on behalf of GBCL Corporate | | |
| **Sellers of Travel** | Multiple sellers of travel operated as a buffer layer between GBCL Corporate and the Call Centers, and contracted with Call Centers to telemarket cruise vacation packages for GBCL Corporate | **GBCL\*** Owner: Worstell Control: Curtis & DiGiacomo | | **Unnamed Sellers of Travel** Owners: Various Control: Curtis & DiGiacomo |
| **Call Centers** | The Call Centers employed telemarketers who received inbound transfers and/or made outbound telephone calls to induce consumers to purchase cruise vacation packages and upgrades | **Cabb Group\*** Owner: C. Peterson Control: Petersons | **Florida V.S.C.\*** Owner: VSC Control: DiGiacomo | **Unnamed Call Centers** Owners: Various Control: Various |
| **Verification, Authorization, & Processing** | GBCL Corporate used these companies to process consumer payments, secure accommodations aboard the cruise ship and/or provide various administrative services | **Royal Bahama\*** Owners: Curtis & DiGiacomo Control: Curtis & DiGiacomo | **Tropical Accommodations\*** Owner: Cotroneo Control: Curtis & DiGiacomo | **VSC\*** Owners: Curtis & DiGiacomo Control: Curtis & DiGiacomo |

6.     Royal Bahama and GBCL contracted with various third-party lead generators to place calls to consumers using prerecorded messages, including calls to numbers on the DNC Registry, to generate potential customers for the sale of the "free" cruise vacation packages (customers paid federal port taxes and fees, and the cost of vacation upgrades.)  After asking several automated survey questions wholly unrelated to the cruises, the prerecorded messages typically informed consumers that they were entitled to "two free boarding passes for an all-inclusive cruise to the Bahamas," which would cost $59 per person in port taxes.  Consumers who confirmed their interest in the "free" cruise offer either received a subsequent call within 24 hours or were immediately transferred to a telemarketer at a telephone call center working on behalf of Royal Bahama and GBCL.

7.      Since at least 2014, GBCL Corporate has known or consciously avoided knowing that many of the survey robocalls dialed by the lead generators and the subsequent outbound telephone calls to consumers were unlawful.  GBCL Corporate includes recidivist companies that have been investigated and/or sued by state government agencies and private litigants challenging unlawful telemarketing calls.  Nevertheless, GBCL Corporate continued to help survey robocall lead generators make illegal robocalls and provided other telemarketers and vendors with the tools they needed to make unlawful telemarketing calls for years.

8.      Defendants Cabb Group, LLC ("Cabb Group") and Florida V.S.C., Inc. ("Florida V.S.C.")  (collectively, the "Call Centers") operated telephone call centers that employed telemarketers. After logging into an automated web-based dialing platform ("autodialer"), the Call Centers notified GBCL Corporate that their telemarketers were available to speak to consumers.  Consumers were typically pre-screened for eligibility and interest during a prerecorded message, and sometimes were transferred to an available telemarketer.   The Defendants refer to these transferred calls as "inbound transfers."  In other instances, and usually within 24 hours, the Call Centers placed outbound calls to eligible and interested consumers.

9.      The Call Centers utilized marketing materials and scripts provided by GBCL Corporate to sell consumers various items, including cruise excursions, pre-boarding hotels, enhanced accommodations, and other travel packages related to the cruise offers.

10.     The Call Centers knew or consciously avoided knowing that the survey robocalls and outbound telephone calls placed to consumers were unlawful.  They regularly received complaints from consumers who had received telephone calls despite the fact that their telephone numbers were on the DNC Registry or that they had previously stated they did not wish to receive outbound telephone calls made by or on behalf of the seller whose goods or services

were being offered.  Nevertheless, the Call Centers substantially assisted GBCL Corporate's illegal telemarketing operation by receiving inbound transfers and/or placing outbound telephone calls to consumers, in violation of the TSR.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a) and 57b.  This action arises under 15 U.S.C. § 45(a).

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (d) and 1395(a), and 15 U.S.C. § 53(b).

## DEFENDANTS

13.     Defendant Grand Bahama Cruise Line, LLC ("GBCL") is a former for-profit Florida limited liability company that dissolved on February 21, 2017.  GBCL was a seller and telemarketer that initiated, caused the initiation of, and assisted and facilitated the initiation of outbound telephone calls to induce consumers to purchase cruise vacation packages.  GBCL has been the subject of multiple consumer class action lawsuits alleging violations of the Telephone Consumer Protection Act (TCPA).  *See Bartlett v. Grand Bahama Cruise Line, LLC,* No. 6:15-cv-01530 (M.D. Fla. 2015); *Phan v. Grand Bahama Cruise Line, LLC*, No. 115cv286216 (Cal. Super. Ct. 2015) [removed to N.D. Cal. No. 5:15-cv-5019].  At times material to this Complaint, GBCL has performed various business functions on behalf of Royal Bahama, or overseen such business functions, including advertising, marketing, lead generation, and customer service. GBCL, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

14.     Defendant Ultimate Vacation Group, LLC also d/b/a Royal Bahama Cruise Line ("Ultimate Vacation Group" or "Royal Bahama") is a former for-profit Florida limited liability company that dissolved on September 22, 2017.  Royal Bahama was a seller and telemarketer that initiated, caused the initiation of, and assisted and facilitated the initiation of outbound telephone calls to induce consumers to purchase cruise vacation packages.  Royal Bahama is a recidivist telemarketer that has been the subject of a state enforcement action involving violations of the Do Not Call Registry and a consumer class action lawsuit alleging violations of the TCPA.  *See In the Matter of Ultimate Vacations Group, LLC dba Royal Bahama Cruise Line*, No. 2014-0035 (*State of New York Dept. of State,* consent order, May 19, 2016); *Shields v. Ultimate Vacation Group, et al*., No. 3:14-cv-00285 (S.D. Tex.).  Royal Bahama, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

15.     Defendant Tropical Accommodations LLC also d/b/a Grand Celebration Cruise Line ("Tropical Accommodations") is a for-profit Florida limited liability company with its principal place of business at 555 Winderley Place, Suite 300, Maitland, Florida 32751.  Tropical Accommodations is a seller that caused the initiation of, and assisted and facilitated the initiation of, outbound telephone calls to induce consumers to purchase cruise vacation packages.  At all times material to this Complaint, Tropical Accommodations has performed various business functions on behalf of Royal Bahama, GBCL, and VSC, or overseen such business functions, including fulfillment, payment processing, customer service, verification service, authorization, and quality assurance.  Also at all times material to this Complaint, acting alone or in concert with others, Tropical Accommodations has assisted and facilitated the acts or practices set forth

in this Complaint.  Tropical Accommodations, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

16.     Defendant VSC is a for-profit Delaware limited liability company with its principal place of business at 2950 Lake Emma Road, Suite 3020, Lake Mary, Florida 32746. VSC is a seller and telemarketer that initiated, caused the initiation of, and assisted and facilitated the initiation of outbound telephone calls to induce consumers to purchase cruise vacation packages.  At times material to this Complaint, VSC has performed various business functions on behalf of Royal Bahama and GBCL, or overseen such business functions, including advertising, marketing, customer service, verification service, authorizations, and quality assurance.  Also at times material to this Complaint, acting alone or in concert with others, VSC has assisted and facilitated the acts or practices set forth in this Complaint. VSC, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17.     Defendant Johnathan Blake Curtis is a manager of VSC.  Defendant Curtis also was a manager of Royal Bahama and a *de facto* manager of GBCL and Tropical Accommodations.  At all times material to this Complaint, acting alone or in concert with others, Curtis has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GBCL Corporate set forth in this Complaint.  Defendant Curtis resides in Sanford, Florida, and in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

18.     Defendant Anthony DiGiacomo is a manager of VSC.  Defendant DiGiacomo also was a manager of Royal Bahama and a *de facto* manager of GBCL, Tropical Accommodations, and Florida V.S.C.  At all times material to this Complaint, acting alone or in

concert with others, DiGiacomo has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GBCL Corporate set forth in this Complaint. Defendant DiGiacomo resides in Sanford, Florida, and in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

19.     Defendant Christopher A. Cotroneo is the sole owner and manager of Tropical Accommodations.  At all times material to this Complaint, acting alone or in concert with others, Cotroneo has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of GBCL Corporate set forth in this Complaint.  Defendant Cotroneo resides in Sanford, Florida, and in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

20.     Defendant Cabb Group, LLC ("Cabb Group") is a for-profit Florida limited liability company with its principal place of business at 2400 S Ridgewood Avenue, Unit #25, South Daytona, Florida 32119.  Cabb Group is a seller and telemarketer that initiated, caused the initiation of, and assisted and facilitated the initiation of outbound telephone calls to induce consumers to purchase cruise vacation packages.  Cabb Group, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

21.     Defendant Florida V.S.C. is a former for-profit Florida limited liability company that dissolved on September 28, 2018.  Florida V.S.C. was a wholly-owned subsidiary of VSC, with its principal place of business at 2950 Lake Emma Road, Suite 3020, Lake Mary, Florida 32746.  Florida V.S.C. is also a seller and telemarketer that initiated, caused the initiation of, and assisted and facilitated the initiation of outbound telephone calls to induce consumers to

purchase cruise vacation packages.  Florida V.S.C., in connection with the matters alleged

herein, transacts or has transacted business in this district and throughout the United States.

22.     Defendant Christina R. Peterson is an owner and manager of Cabb Group.  At all

times material to this Complaint, acting alone or in concert with others, Christina R. Peterson had

the authority and responsibility to prevent or correct the unlawful telemarketing practices of

Cabb Group, and formulated, directed, controlled, or participated in the acts and practices of

Cabb Group, including the acts and practices set forth in this Complaint.  Defendant Christina R.

Peterson resides in Osteen, Florida, and in connection with the matters alleged herein, transacts

or has transacted business in this district and throughout the United States.

23.     Defendant Robert J. Peterson II is a manager of Cabb Group.  At all times

material to this Complaint, acting alone or in concert with others, Robert J. Peterson II had the

authority and responsibility to prevent or correct the unlawful telemarketing practices of Cabb

Group, and formulated, directed, controlled, or participated in the acts and practices of Cabb

Group, including the acts and practices set forth in this Complaint.  Defendant Robert J. Peterson

II resides in Osteen, Florida, and in connection with the matters alleged herein, transacts or has

transacted business in this district and throughout the United States.

24.     Defendants Christina R. Peterson and Robert J. Peterson are hereinafter

collectively referred to as the "Petersons."  Defendants Cabb Group, Florida V.S.C., and the

Petersons are hereinafter collectively referred to as the "Call Center Defendants."

## COMMON ENTERPRISE

25.     The GBCL Corporate entities—Ultimate Vacation Group also d/b/a Royal

Bahama, GBCL, Tropical Accommodations, VSC, and Florida V.S.C. (collectively, the

"Common Enterprise Defendants") —have operated as a common enterprise while engaging in

the acts and practices alleged below.  Royal Bahama began as a d/b/a of Ultimate Vacation
Group in 2013.  GBCL was incorporated in June 2014 and took over relevant business operations
from Royal Bahama in approximately January 2015.  Tropical Accommodations and VSC also
joined the common enterprise in 2014; they took over the interests of Royal Bahama and GBCL,
which both ceased operations in 2017.  Florida V.S.C. was incorporated in February 2015, when
it took over the relevant in-house call center operations. (Because of Florida V.S.C.'s dual role—
as a wholly-owned subsidiary of VSC and as a call center—it is both a Common Enterprise
Defendant and a Call Center Defendant.)

26.     The Common Enterprise Defendants conducted the business practices described
below through an interrelated network of companies that have common management,
coordinated business functions, shared office space, employees and resources, and that marketed
and sold common products, shared revenues, and comingled funds.  Because the Common
Enterprise Defendants operated as such, each of the entities that comprise the enterprise is jointly
and severally liable for the acts and practices of Royal Bahama, GBCL, Tropical
Accommodations, VSC, and Florida V.S.C. during the time in which they participated in the
common enterprise.  At all times material to this Complaint, Curtis, DiGiacomo, and Cotroneo
formulated, directed, controlled, had the authority to control, or participated in the acts and
practices of the defendants that constitute the Common Enterprise Defendants.

**COMMERCE**

27.     At all times material to this Complaint, Defendants have maintained a substantial
course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,
15 U.S.C. § 44.

## THE TELEMARKETING SALES RULE

28.     Congress directed the Commission to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The Commission adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  *See* 16 C.F.R. Part 310.

29.     Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the Commission (the "National Do Not Call Registry" or "DNC Registry"), of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.

30.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

31.     The Commission allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

32.     Under the TSR, a "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  A "Seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  *Id*. § 301.2(dd).

33.     Under the TSR, an "outbound telephone call" is a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

34.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).

35.     The TSR also prohibits sellers and telemarketers from initiating an outbound telephone call to any person when that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered.  16 C.F.R. § 310.4(b)(1)(iii)(A).

36.     As amended, effective September 1, 2009, 16 C.F.R. § 310.4(b)(1)(v) of the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller.  The express agreement must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.  16 C.F.R. § 310.4(b)(1)(v)(A).

37.     The TSR also requires that sellers and telemarketers transmit or cause to be transmitted the telephone number of the telemarketer and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on

whose behalf the call is made and, when made available by the telemarketer's carrier, the name of the seller.  16 C.F.R. § 310.4(a)(8).

38.     It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the TSR.  16 C.F.R. § 310.3(b).

39.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## GBCL CORPORATE'S BUSINESS ACTIVITIES

### *Formation of GBCL Corporate*

40.     Beginning in 2011, the owners of CCL operated multiple subsidiary companies that entered into fulfillment agreements with dozens of companies that ran illegal telemarketing campaigns on their behalf.  These telemarketers offered, and the subsidiary companies fulfilled, "free" cruise vacations aboard the MS Bahamas Celebration cruise ship, until the ship struck an object and was badly damaged on October 31, 2014.

41.     In January 2015 (shortly after the MS Bahamas Celebration was damaged), the owners of CCL formed a new cruise line company called Bahamas Paradise Cruise Line and purchased a new cruise ship, which they named the MV Grand Celebration.

42.     Under Florida law, any person or business that sells or promotes travel-related services must register annually as a seller of travel with the Florida Department of Agriculture and Consumer Services.  Fla. Stat. § 559.928 (2018).

43.     In 2013, Curtis and DiGiacomo registered Ultimate Vacation Group as a licensed seller of travel that procured its own survey robocall leads and utilized other third-party call centers—in addition to its own in-house call center—to market cruise vacation packages to its own sales leads on behalf of CCL.  Also in 2013, Ultimate Vacation Group began doing business as Royal Bahama Cruise Line because Curtis and DiGiacomo thought the company needed a better name.

44.     In June 2014, Curtis and DiGiacomo assisted with the incorporation of GBCL, and appointed the office administrator for Royal Bahama as the titular manager of GBCL. GBCL registered as a licensed seller of travel, but essentially lay dormant for several months.

45.     In September 2014, Curtis and DiGiacomo assisted with the incorporation of Tropical Accommodations, and appointed Christopher Cotroneo, an IT and quality assurance employee of Royal Bahama, as the titular owner and manager of Tropical Accommodations. Cotroneo is the only employee Tropical Accommodations has ever had.  He registered Tropical Accommodations as a licensed seller of travel, registered websites for it, and signed contracts on its behalf.  But behind the scenes, Curtis and DiGiacomo also operated as *de facto* managers of Tropical Accommodations, formulating, directing, controlling, and participating in the acts and practices of the company.

46.     In November 2014, Curtis and DiGiacomo incorporated VSC to provide administrative services for the entire telemarketing operation, including customer service, verification service, authorization, and quality assurance.

47.     In or around January 2015, GBCL effectively took over relevant business operations from Royal Bahama.  GBCL had no employees of its own.  Behind the scenes, Curtis

and DiGiacomo operated as *de facto* managers of GBCL, formulating, directing, controlling, and participating in the acts and practices of the company.

48.     In or around February 2015, Tropical Accommodations acquired Royal Bahama's merchant account—the account it used to process credit card payments from consumers—and began processing consumer payments on behalf of the entire telemarketing operation.

49.     The entire telemarketing operation functioned as it had before the crash, but for the new cruise ship, the MV Grand Celebration.

50.     In 2017, Royal Bahama and GBCL officially dissolved, leaving their business interests to Tropical Accommodations and VSC.

### Agreements with Cruise Lines' Subsidiary Fulfillment Companies

51.     Notwithstanding the FTC's lawsuit in 2015 and the settlement order in 2016, the owners of CCL continued operating subsidiary companies that fulfilled "free" cruise vacations marketed and sold by companies running telemarketing campaigns.

52.     Between 2013 and 2017, Royal Bahama, GBCL, and Tropical Accommodations entered into several agreements with the cruise lines' subsidiary fulfillment companies wherein Royal Bahama, GBCL, and Tropical Accommodations agreed to market and sell cruise vacation packages, and operate a telephone call center business, in order to sell cruise vacation packages.

### Agreements with Call Centers

53.     Beginning in 2013, Royal Bahama, Curtis, and DiGiacomo operated their own in-house call center that employed telemarketers who marketed and sold cruise vacation packages fulfilled by the cruise lines' subsidiary companies.  In February 2015, Florida V.S.C. incorporated and took over the relevant in-house call center operations.

54.     Beginning in mid-to-late 2014, GBCL Corporate also developed and managed an external telemarketing program conducted by third-party call centers; GBCL Corporate sometimes referred to the call centers as "independent agents."

55.     Between 2014 and 2017, Curtis negotiated "Commission Agreement Call Center Contracts" ("Call Center Contracts") for Florida V.S.C, Cabb Group, and other third-party call centers, to provide call center services to registered sellers of travel.  Royal Bahama was the first such seller of travel, followed by GBCL and non-party entities such as Blue Star Cruises LLC and Atlantic Accommodations & Cruises, LLC.  Upon information and belief, GBCL, Blue Star Cruises, and Atlantic Accommodations (none of which was formally owned by Curtis or DiGiacomo) were simply buffer companies; they served no other purpose than to conceal that GBCL Corporate was actually the true party to the Call Center Contracts.

56.     Pursuant to the Call Center Contracts, the Call Centers employed telemarketers who received inbound transfers and/or made outbound telephone calls to induce consumers to purchase "free" cruise vacation packages.  GBCL Corporate provided the Call Centers with marketing materials and scripts.  DiGiacomo periodically conducted training sessions at the offices of the Call Centers, instructing the telemarketers on sales techniques to market and sell the cruise vacation packages.

57.     Although consumers received a nominally free 2-day cruise, the Call Centers' telemarketers typically made aggressive sales pitches designed to induce consumers to purchase vacation upgrades, such as hotels, rental cars, extended stays, and additional excursions that could result in significant additional charges to consumers.  The Call Centers earned commissions paid by GBCL Corporate based upon the specific vacation packages sold to consumers.

58.     GBCL Corporate agreed to fulfill all cruise packages by corresponding with the cruise ship operator (and/or its agents) to ensure that the Call Centers' customers were able to secure the accommodations and other services purchased.  VSC provided administrative services for the Call Centers, which included customer service, verification, authorization, and quality assurance.

### Survey Robocall Lead Generation Program

59.     GBCL Corporate's illegal telemarketing operation involved two steps.  First, Royal Bahama and GBCL purchased sales leads, *i.e.*, a way to identify consumers who were interested in a cruise, from lead generators that placed survey robocalls to consumers.  The survey robocalls offered "free" cruise vacation packages to consumers who were willing to answer a few questions about topics wholly unrelated to cruise vacations.  Second, the survey robocallers either (1) immediately transferred the interested consumers to Cabb Group, Florida V.S.C., and other call centers, or (2) transmitted consumers' telephone numbers to autodialer companies that placed subsequent outbound telephone calls to consumers and then connected them with Cabb Group, Florida V.S.C., and other call centers.

60.     Between 2014 and 2017, Royal Bahama and GBCL executed agreements with multiple lead generators that conducted survey robocalls *via* agent-guided prerecorded messaging to identify potential customers for the sale of vacation cruise packages.  During that time-period, Royal Bahama and GBCL initiated or caused robocall lead generators to initiate millions of such prerecorded messages to consumers, typically by agreeing to pay their robocall lead generators $2.00 per sales lead.

61.     The prerecorded messages heard by consumers typically encouraged survey participation by offering two cruise vacation tickets to the Bahamas for "free," although

consumers had to pay federal port taxes and fees.  Consumers who answered several automated questions and confirmed their interest in the "free" cruise offer either received a subsequent call within 24 hours or were immediately transferred to a telemarketer working for one of the Call Center Defendants.

62.     DiGiacomo admitted to the Federal Trade Commission that Royal Bahama and GBCL did not scrub their sales leads to remove telephone numbers listed on the DNC Registry; rather, they purchased leads from survey robocallers that purported to have scrubbed the phone numbers of the sales leads against the DNC Registry or obtained consumers' express prior written consent to receive telemarketing calls about a cruise vacation.

63.     In fact, millions of these survey robocalls delivered prerecorded messages offering "free" cruise vacations to consumers who had not signed an express agreement, in writing, that authorizes delivery of prerecorded messages by or on behalf of the seller whose goods or services were being offered, in violation of the TSR.  Moreover, many of these calls were made to telephone numbers that were listed on the DNC Registry more than 30 days before the call, which is a separate TSR violation.

64.     Both GBCL Corporate and the Call Centers have received numerous complaints from consumers stating that they received survey robocalls that delivered prerecorded messages despite the fact that they have not given their express agreement, in writing, authorizing delivery of prerecorded messages by or on behalf of the seller whose goods or services were being offered.

*Automated Web-Dialing Platform*

65.     Between 2014 and 2017, Royal Bahama and GBCL entered into agreements with multiple vendors that provided autodialers through which users can place large volumes of autodialed telephone calls.

66.     During this same timeperiod, the Call Centers also entered into agreements with the same autodialer vendors, which included voice over internet protocol "VoIP" phone services, as well as software permitting users to receive inbound transfers and place outbound telephone calls.  Curtis personally negotiated these contracts between the autodialer vendors and the Call Centers, and DiGiacomo ensured that the autodialer functioned properly at the offices of the Call Centers.

67.     From 2014 to 2018, Royal Bahama and GBCL initiated or caused their survey robocall lead generators to initiate unlawful outbound telephone calls by permitting robocall lead generators to transmit or download sales leads into the autodialer for future outbound telephone calls.

68.     Pursuant to Royal Bahama's and GBCL's agreements with the autodialer vendors, Royal Bahama, GBCL, and DiGiacomo initiated or caused the autodialer vendors to initiate outbound telephone calls to consumers by permitting or enabling the autodialer vendors to start and stop dialing campaigns to sales leads transmitted to the autodialer.

69.     The Call Center Defendants accessed the autodialing software by virtue of a website "portal" that allowed each telemarketer, using a username and password, to log into the server hosted or maintained by the autodialer vendors.  The Call Center Defendants initiated or caused the autodialer vendors to initiate outbound telephone calls by using the web-based

autodialer platform to start outbound calling campaigns.  The Call Center Defendants also initiated outbound telephone calls by autodialing consumers directly.

70.     These web-based dialing platforms allow the user to choose the caller ID that accompanies their calls—that is, they can upload lists of caller ID numbers that they want displayed with their outbound telephone calls.  The users can "spoof" caller IDs—that is, they can transmit inaccurate caller ID numbers with their outbound telephone calls.  "Neighbor spoofing" is a form of caller ID spoofing and occurs when a caller spoofs the area code and exchange of a consumer's phone number so that the consumer thinks the call is coming from someone near them.  For instance, a consumer with the phone number 407-555-1234 might receive a call from a spoofed caller ID number that displays as 407-555-1201.

71.     The autodialer vendors provided Royal Bahama, GBCL, and the Call Center Defendants with the means for inputting the desired caller ID number into the autodialers that would be transmitted with the outbound telephone calls.

72.     GBCL Corporate and the Call Centers have received numerous complaints from consumers stating they received outbound telephone calls (1) despite the fact that their telephone numbers were on the DNC Registry; (2) despite previously stating to the telemarketer that they did not wish to receive outbound telephone calls made by or on behalf of the seller whose goods or services are being offered; and/or (3) that did not transmit or cause to be transmitted to caller identification services the telephone number of the telemarketer making the call.  In addition, consumers complained about receiving illegal robocalls.

**Royal Bahama and GBCL Violated the Telemarketing Sales Rule**

73.     In numerous instances, Royal Bahama and GBCL made telemarketing calls on behalf of the cruise lines' subsidiary fulfillment companies: (1) that delivered a prerecorded message, in violation of 16 C.F.R. § 310.4(b)(1)(v); (2) to numbers listed on the DNC Registry,

in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B); (3) to consumers who had previously stated that they did not wish to receive outbound telephone calls by or on behalf of the seller whose goods or services are being offered, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(A); and (4) that did not transmit or cause to be transmitted to caller identification services the telephone number of the telemarketer making the call, in violation of § 310.4(a)(8).

74.     Royal Bahama and GBCL are "sellers" and "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

75.     Royal Bahama and GBCL are sellers and telemarketers of goods or services (including "free" cruise vacation packages) to consumers.  Royal Bahama and GBCL have caused telemarketers (including survey robocall lead generators and the Call Centers) to call consumers to induce the purchase of goods or services from the cruise lines' subsidiary fulfillment companies.

76.     Royal Bahama and GBCL also operated their own in-house call center, which employed telemarketers who marketed and sold cruise vacation packages fulfilled by the cruise lines' subsidiary companies.

77.     Royal Bahama and GBCL are sellers and telemarketers that initiated and caused others to initiate outbound telephone calls to consumers to induce the purchase of goods or services fulfilled by the cruise lines' subsidiary companies.

78.      Royal Bahama and GBCL have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of goods or services by use of one or more telephones and which involves more than one interstate telephone call.  Specifically, Royal Bahama and GBCL made phone calls marketing cruise vacation packages to consumers.

79.     At all times relevant to this Complaint, Royal Bahama and GBCL have maintained a substantial course of trade or business in the offering for sale and sale of goods or services via the telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

80.     In the course of the telemarketing described above, since September 1, 2009, Royal Bahama and GBCL have initiated or caused survey robocall lead generators to initiate outbound telephone calls that deliver prerecorded messages offering goods or services to persons who have not signed an express agreement, in writing, that authorizes delivery of prerecorded messages by or on behalf of the seller whose goods or services were being offered.

81.     To induce the purchase of goods or services, Royal Bahama and GBCL initiated or caused survey robocall lead generators and the Call Center Defendants to initiate telephone calls to telephone numbers on the DNC Registry.

82.     To induce the purchase of goods or services, Royal Bahama and GBCL initiated or caused survey robocall lead generators and the Call Center Defendants to initiate telephone calls to the telephone numbers of consumers who have previously stated that they did not wish to receive outbound telephone calls made by or on behalf of the seller whose goods or services are being offered.

83.     In the course of the telemarketing described above, Royal Bahama and GBCL did not transmit or cause to be transmitted to caller identification services the telephone number of the telemarketer making the call.

**Royal Bahama, Tropical Accommodations, and VSC Substantially Assisted and Facilitated Illegal Calls**

84.     Initially, Royal Bahama substantially assisted the Call Centers in three ways: (1) processing consumer payments on behalf of the entire telemarketing operation; (2)

corresponding with the cruise ship operators (and/or their agents) to ensure that the Call Centers'

customers were able to secure the accommodations and other services purchased; and (3)

providing customer service, verification service, authorization, and quality assurance on behalf

of the Call Centers.

85.     Subsequently, when Tropical Accommodations took over the role of Royal

Bahama, Tropical Accommodations substantially assisted the Call Centers in the same three

ways.

86.     VSC substantially assisted the Call Centers by providing administrative services

including customer service, verification, authorization, and quality assurance.

**Royal Bahama, Tropical Accommodations and VSC Knew or Consciously Avoided
Knowing That Telemarketers Were Violating the TSR**

87.     Royal Bahama, Tropical Accommodations, and VSC knew, or consciously

avoided knowing, that the Call Centers were violating the TSR.  Curtis and DiGiacomo

spearheaded the entire telemarketing operation with knowledge of its illegality, and both

operated as managers or *de facto* managers of Royal Bahama, Tropical Accommodations, and

VSC.  Cotroneo provided quality assurance, which involved listening in on some telemarketing

calls; during those calls, he heard consumers complain that they were on the DNC Registry and

did not want to be called.

88.     Both Curtis and Cotroneo regularly sent emails to the Call Center Defendants

with subjects such as "DNC REMOVAL" or "Remove" instructing them to remove from their

autodialers and marketing database telephone numbers of consumers who complained about

receiving outbound telephone calls despite the fact that their telephone numbers were on the

DNC Registry.  The Call Center Defendants also compiled their own internal do-not-call lists

and regularly sent emails to Royal Bahama and/or Curtis advising them of these consumer

complaints.

89.     Consumer complaints also flowed into the offices of Royal Bahama and VSC on a

regular basis from consumers who complained of receiving (1) illegal robocalls; (2) telephone

calls despite the fact that their telephone numbers were listed on the DNC Registry; or (3)

telephone calls despite previously stating they did not wish to receive outbound telephone calls

made by or on behalf of the seller whose goods or services are being offered.

### Royal Bahama, Tropical Accommodations and VSC
### Violated the Telemarketing Sales Rule

90.     Royal Bahama, Tropical Accommodations, and VSC have provided substantial

assistance or support to "seller[s]" and "telemarketer[s]" engaged in "telemarketing," as defined

by the TSR, 16 C.F.R. § 310.2.

91.     Beginning in 2014, Royal Bahama, Tropical Accommodations and VSC provided

substantial assistance and support to GBCL and/or the survey robocall lead generators, by,

among other things, engaging in the conduct set forth herein, even though Royal Bahama,

Tropical Accommodations and VSC knew, or consciously avoided knowing, that GBCL and/or

the survey robocall lead generators were engaged in violations of Section 310.4 of the TSR.

92.     In numerous instances since September 1, 2009, Royal Bahama, GBCL, and their

survey robocall lead generators made outbound telephone calls that delivered prerecorded

messages to induce the sale of goods or services when the persons to whom these telephone calls

were made had not expressly agreed, in writing, to authorize the seller to place prerecorded calls

to such person.

93.     Royal Bahama, Tropical Accommodations and VSC knew, or consciously

avoided knowing, that GBCL, and their survey robocall lead generators were making such calls.

94.     In numerous instances, GBCL and the survey robocall lead generators made outbound telephone calls to induce the sale of goods or services to numbers listed on the DNC Registry.

95.     Royal Bahama, Tropical Accommodations and VSC knew, or consciously avoided knowing, that GBCL and the survey robocall lead generators were making such calls.

96.     In numerous instances, GBCL and the survey robocall lead generators made outbound telephone calls to induce the sale of goods or services to consumers who previously stated that they did not wish to receive such outbound telephone calls made by or on behalf of the seller whose goods or services were being offered.

97.     Royal Bahama, Tropical Accommodations and VSC knew, or consciously avoided knowing, that GBCL and the survey robocall lead generators were making such calls.

98.     In numerous instances, GBCL and the survey robocall lead generators made outbound telephone calls that failed to transmit or cause to be transmitted the telephone number of the telemarketer or seller.

99.     Royal Bahama, Tropical Accommodations and VSC knew, or consciously avoided knowing, that GBCL and the survey robocall lead generators were making such calls.

## THE CALL CENTER DEFENDANTS' BUSINESS ACTIVITIES

### The Call Center Defendants Substantially Assisted and Facilitated Illegal Calls, Including the Robocalls

100.    The Call Center Defendants substantially assisted telemarketers, including GBCL Corporate, by employing telemarketers to receive inbound transfers and/or place outbound telephone calls to induce consumers to purchase "free" cruise vacation packages.  The Call Centers' telemarketers typically made sales pitches designed to induce consumers to purchase

vacation upgrades, such as hotels, rental cars, extended stays, and additional excursions that could result in significant additional charges to consumers.

### The Call Center Defendants Knew or Consciously Avoided Knowing That GBCL Corporate Was Violating the TSR

101.    The Call Center Defendants signed Call Center Contracts pursuant to which they acknowledged and agreed to comply with all laws and applicable rules and regulations pertaining to their provision of call center services, including the TSR.

102.    The Call Center Defendants knew or consciously avoiding knowing that GBCL Corporate was violating the TSR.

103.    The Call Center Defendants were aware that Royal Bahama and GBCL initiated or caused others to initiate prerecorded messages to generate potential customers for the sale of cruise vacation packages without obtaining from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver the prerecorded messages.

104.    Both Curtis and Cotroneo regularly sent emails to the Call Center Defendants with subjects such as "DNC REMOVAL" or "Remove," instructing them to remove from their autodialers and marketing database telephone numbers of consumers that complained of receiving outbound telephone calls, including survey robocalls.

105.    Consumer complaints also flowed into the offices of the Call Center Defendants on a regular basis.  The Call Center Defendants' telemarketers received inbound transfers of consumers who complained of receiving telephone calls, despite the fact that their telephone numbers were on the DNC Registry or previously stated that they did not wish to receive outbound telephone calls made by or on behalf of the seller whose goods or services are being offered.  In addition, consumers complained about receiving illegal robocalls.  The Call Center

Defendants compiled their own internal do-not-call lists and regularly sent emails to GBCL Corporate notifying them of these consumer complaints.

106.    The Call Centers had no capability to scrub consumer phone numbers against the DNC Registry.

107.    One incident from on or about August 8, 2017 provides an example of Cabb Group receiving a consumer complaint.  During a call with a consumer on or about August 8, 2017, the consumer asked Cabb Group's telemarketer:  "Why did this [telephone call] pop up for a local call number on my phone?"  Cabb Group's telemarketer responded: "The computer is a routing system, so whatever area we're calling, it's going to generate a local number to the area code."  The consumer persisted in describing the telephone call he received as an example of neighbor spoofing: "The computer takes my friend and pops my friend's name up on my phone from the ID like it was calling from my neighbor up here is what it done. Yeah, so it's a telemarketer calling me and it's Grand Imperial Cruises in Orlando, Florida. That's what I need to know where I can report this to my public service commissioner about a [sic] falsifying information when it pops up on my phone."

108.    The Call Center Defendants, however, continued to provide call center services to GBCL Corporate, and depended upon GBCL Corporate to resolve these consumer complaints with the survey robocallers.

### The Call Center Defendants Violated the Telemarketing Sales Rule

109.    In numerous instances, the Call Center Defendants made telemarketing calls: (1) to numbers listed on the National Do Not Call Registry, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B); and (2) that did not transmit or cause to be transmitted to caller identification services the telephone number of the telemarketer making the call, in violation of § 310.4(a)(8).

110.    The Call Center Defendants are "sellers" and "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

111.    The Call Center Defendants are sellers and telemarketers that initiated or caused others to initiate outbound telephone calls to consumers to induce the purchase of goods or services (including "free" cruise vacation packages) fulfilled by the cruise lines' subsidiary companies.

112.    The Call Center Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of goods or services by use of one or more telephones and which involves more than one interstate telephone call.  Specifically, the Call Center Defendants made phone calls marketing cruise vacation packages to consumers.

113.    At all times relevant to this Complaint, the Call Center Defendants have maintained a substantial course of trade or business in the offering for sale and sale of goods or services via the telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

114.    To induce the purchase of goods or services, the Call Center Defendants initiated or caused others to initiate telephone calls to telephone numbers on the National Do Not Call Registry.

115.    In the course of the telemarketing described above, the Call Center Defendants did not transmit or cause to be transmitted to caller identification services the telephone number of the telemarketer making the call.

116.    The Call Center Defendants have also provided substantial assistance or support to "seller[s]" and "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

117.    Beginning in 2014, the Call Center Defendants provided substantial assistance and support to GBCL Corporate and its survey robocall lead generators, by, among other things, engaging in the conduct set forth herein, even though the Call Center Defendants knew, or consciously avoided knowing, that Royal Bahama, GBCL, and their survey robocall lead generators, were engaged in violations of Section 310.4 of the TSR.

118.    In numerous instances since September 1, 2009, Royal Bahama, GBCL, and their survey robocall lead generators made outbound telephone calls that delivered prerecorded messages to induce the sale of goods or services when the persons to whom these telephone calls were made had not expressly agreed, in writing, to authorize the seller to place prerecorded calls to such person.

119.    The Call Center Defendants knew, or consciously avoided knowing, that GBCL Corporate and its survey robocall lead generators were making such calls.

120.    In numerous instances, Royal Bahama, GBCL, and their survey robocall lead generators made outbound telephone calls to induce the sale of goods or services to numbers listed on the DNC Registry.

121.    The Call Center Defendants knew, or consciously avoided knowing, that GBCL Corporate and its survey robocall lead generators were making such calls.

122.    In numerous instances, Royal Bahama, GBCL, and their survey robocall lead generators made outbound telephone calls to induce the sale of goods or services to consumers who previously stated that they did not wish to receive such outbound telephone call made by or on behalf of the seller whose goods or services were being offered.

123.    The Call Center Defendants knew, or consciously avoided knowing, that Royal Bahama, GBCL, and their survey robocall lead generators were making such calls.

124.     In numerous instances, Royal Bahama, GBCL, and their survey robocall lead generators made outbound telephone calls that failed to transmit or cause to be transmitted the telephone number of the telemarketer or seller.

125.     The Call Center Defendants knew, or consciously avoided knowing, that Royal Bahama, GBCL, and their survey robocall lead generators were making such calls.

### COUNT I – Common Enterprise Defendants, Curtis, DiGiacomo, & Cotroneo
### Initiating Unlawful Prerecorded Messages

126.     In numerous instances, in connection with telemarketing, the Common Enterprise Defendants, Curtis, DiGiacomo, and Cotroneo initiated or caused others to initiate an outbound telephone call that delivered prerecorded messages to induce the purchase of goods or services in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v).

### COUNT II – Common Enterprise Defendants, Curtis, DiGiacomo, & Cotroneo
### Ignoring Entity-Specific Do Not Call Requests

127.     In numerous instances, in connection with telemarketing, the Common Enterprise Defendants, Curtis, DiGiacomo, and Cotroneo initiated or caused others to initiate an outbound telephone call to a person who had previously stated that he or she did not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services were being offered in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

### COUNT III – Common Enterprise Defendants, Curtis, DiGiacomo, Cotroneo,
### Cabb Group, & the Petersons
### Violating the National Do Not Call Registry

128.     In numerous instances, in connection with telemarketing, the Common Enterprise Defendants, Curtis, DiGiacomo, Cotroneo, Cabb Group and the Petersons initiated or caused others to initiate an outbound telephone call to a person's telephone number on the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

### COUNT IV – Common Enterprise Defendants, Curtis, DiGiacomo, Cotroneo, Cabb Group, & the Petersons
### Failure To Transmit Caller ID

129.    In numerous instances, in connection with telemarketing, the Common Enterprise Defendants, Curtis, DiGiacomo, Cotroneo, Cabb Group and the Petersons have failed to transmit or have caused telemarketers to fail to transmit the telephone number of the telemarketer making the call to any caller identification service in use by the recipient of a telemarketing call, in violation of the TSR, 16 C.F.R. § 310.4(a)(8).

### COUNT V – Common Enterprise Defendants, Curtis, DiGiacomo, & Cotroneo
### Assisting and Facilitating Abusive Telemarketing Acts or Practices
### in Violation of the Telemarketing Sales Rule

130.    In numerous instances,  the Common Enterprise Defendants, Curtis, DiGiacomo, and Cotroneo have provided substantial assistance or support, as described above, to Cabb Group and the Petersons, whom the Common Enterprise Defendants, Curtis, DiGiacomo, and Cotroneo knew or consciously avoided knowing were engaged in conduct that violated § 310.4 of the TSR.

131.    The Common Enterprise Defendants, Curtis, DiGiacomo, and Cotroneo's substantial assistance or support as alleged above violates the TSR, 16 C.F.R. § 310.3(b).

### COUNT VI – Call Center Defendants
### Assisting and Facilitating Abusive Telemarketing Acts of Practices in Violation of the
### Telemarketing Sales Rule

132.    In numerous instances, Call Center Defendants have provided substantial assistance or support, as described above, to the Common Enterprise Defendants whom Call Center Defendants knew or consciously avoided knowing were engaged in conduct that violated § 310.4 of the TSR.

133.    Call Center Defendants' substantial assistance or support as alleged above violates the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

134.    Consumers have suffered and will continue to suffer substantial injury as a result of (a) Royal Bahama, GBCL, Curtis, and DiGiacomo's violations of the TSR; and (b) Royal Bahama, Tropical Accommodations, VSC, and the Call Center Defendants' assisting and facilitating violations of the TSR.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

135.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief to prevent and remedy any violation of any provision of law enforced by the Commission.

136.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties.  From 2014 until July 31, 2016, the Court was authorized to award a penalty of up to $16,000 for each violation of the TSR.  *See* 16 C.F.R. § 1.98(d) (2009).  From August 1, 2016 to January 21, 2018, the Court was authorized to award a penalty of up to $40,000 for each violation of the TSR.  *See* 16 C.F.R. § 1.98(d) (2016).  From January 22, 2018 to February 13, 2019, the maximum penalty amount was $41,484 per violation, and effective February 14, 2019, the maximum penalty amount was adjusted to $42,530 per violation, pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. *See* 16 C.F.R. § 1.98(d) (2018); 84 Fed. Reg. 3980 (Feb. 13, 2019).  Defendants' violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

137.     This Court, in the exercise of its equitable jurisdiction, may award ancillary relief including disgorgement and damages to remedy injury caused by Defendants' violations of the TSR and the FTC Act.

138.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court, as authorized by Sections 5(a), 5(m)(1)(A), and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and pursuant to its own equitable powers:

A.     Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint;

B.     Award Plaintiff monetary civil penalties from each Defendant for every violation of the TSR;

C.     Enter a permanent injunction to prevent future violations of the TSR by Defendants;

D.     Order Defendants to pay the costs of this action; and

E.     Award Plaintiff such other and additional relief, including disgorgement and/or damages as the Court may determine to be just and proper.

Respectfully submitted,

Dated: January 10, 2020

ALDEN F. ABBOTT
General Counsel

/s/ Christopher E. Brown
Christopher E. Brown
Jody Goodman
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580
(202) 326-2825; cbrown3@ftc.gov
(202) 326-3096; jgoodman1@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION